# WEBER *v.* HARTMAN, *et al.**

*(Supreme Court of Colorado, December 4th, 1883—Error to the District Court of Arapahoe County.)*

1. ESTRAYS—WHO MAY TAKE UP. Only householders are authorized to take up estrays. The capture of such stock by one not authorized by statute, is a trespass; and the act, if subsequently ratified by one authorized by law to take up estrays, does not become legalized. And *semble*, its only effect is to make him who ratifies, responsible for the original trespass.

2. SAME—NOT TO BE USED. If an estray animal be lawfully taken up by an authorized person, it is unlawful to use such animal—except necessary for its care, as to milk milch cows—and any use thereof is tortious, and relates back to the first step, making the taker-up a trespasser *ab initio.*

3. SAME. Such taker-up, not having complied strictly with the law, is not entitled to any compensation for feeding and caring for the stock, nor to retain possession thereof; but must surrender it on demand.

BECK, C. J. Chancellor Kent defines estrays as "cattle whose owner is unknown." (2 Kent's Com., p. 359.) Blackstone says: "Estrays are such valuable animals as are found wandering in any manor or lordship, and no man knoweth the owner thereof; in which case the law gives them to the King as the general owner and lord paramount of the soil, in recompense for the damage which they may have done therein." 1 Blackstone's Com., *297.

Our statute provides, that "no person shall take up an estray animal except in the county where he resides and is a householder, nor unless the same be found in the vicinity of his residence." Sec. 2565 G. L. 1877.

It is extremely doubtful whether the estray law of this State was ever intended to embrace a case of a mere temporary staying a short distance from the residence of the owner and without fault or negligence on his part. It is more probable that its framers designed it to apply to cases of lost animals; those roaming around the country apparently without owners.

Where horses and cattle are free commoners, and in the absence of statute or ordinance prohibiting them from running at large, even in the streets and highways, it would seem to be an unwarrantable application of the estray law to take up such animals on first sight, without other evidence that they are

---

*Reversing Weber v. Hartman, 2 COLO. LAW REPORTER, 72.

estrays, than the single facts that they have approached the residence of a householder, and that he happens not to know who their owner is.

The horse and mare sought to be replevied in this action were the driving team of the plaintiff in error, who is a resident of North Denver. They escaped from his lot into which he had turned them, and two days afterward came to the livery stable of defendant in error, Hartman, in the same city, situated on the corner of Holladay and Twelfth streets, and distant from the residence of the owner about a mile and a half.

Upon the same morning of their appearance at the stable they were driven into defendant's corral, adjoining the stable, and thereafter detained by him as estrays.

But for this seizure it is probable they would either have returned home, or been found by the owner, who was in pursuit of them, and who not only searched through the different divisions of the city for them, but through the entire neighborhood and surrounding country, as well.

If, however, it be conceded that these animals were estrays, within the meaning of the statute, it then becomes a grave question whether they were lawfully taken up and detained as such.

No one but a householder is authorized to take up an estray animal, and he only when it is found in the vicinity of his residence, as we have seen.

These animals were taken up in Mr. Hartman's absence, and without his knowledge or direction, by the employees in his livery stable. He says he returned to the stable about ten o'clock the same morning, and finding the horses in the corral, inquired how they came there. He testifies that this was the first time he ever saw them.

On learning the facts he continued to detain them, and had them posted and recorded as estrays.

There is no evidence that the men who took them up and put them into the corral were persons authorized by statute to take up estray animals, nor is the defense based upon this ground, but upon the subsequent ratification of the act by Hartman, who was a qualified person.

The counsel for plaintiff in error contends that the statute must be strictly construed as to all its requirements; that the

*taking up* is a material step in the proceedings, which can only be performed by a duly authorized person, and if done without authority, or by one not authorized by statute, the act is incapable of ratification. Upon this proposition the counsel cites numerous authorities, to the effect that, in summary proceedings of this character, the law must be strictly followed in all its details.

Counsel for defendants in error, on the other hand, treat this point as trivial, and insist that the subsequent ratification by Hartman, after learning the circumstances from his men, was equivalent to an original taking up by himself.

Upon examination of authorities, we find that such eminent jurists as Judges Cooley and Christiancy consider the point a substantial one.

*Newson* v. *Hart*, 14 Mich., 235, is a case very similar to this, so far as this feature is involved. The statute under which that case arose authorizes "any resident freeholder, of any township, to take up any stray horses by him found going at large."

A horse was taken up by a minor son of a freeholder, without his previous knowledge or consent, but the act was afterwards fully ratified by the father, so far as it was capable of ratification; and the subsequent proceedings under the statute were conducted by the father in his own name.

The ruling of the Court was, that the act of the son was a trespass, and could only be confirmed by the father as such, so as to make him originally liable as a trespasser. The reasoning is, that the restriction of the power to a certain class of persons was designed as a safeguard against its abuse, and for the protection of the rights of the owners of these animals; that the power given must be strictly pursued, and that none of the safeguards thrown around its exercise can be disregarded.

The Court say: "Other classes of persons might, as a general rule, be not only less able to respond for an abuse of the power, but less careful to inquire into the circumstances before exercising it; less discreet in making seizures, and more disposed to exercise the power under circumstances which would not call for its exercise, than freeholders against whom the same power might be exercised by their neighbors.

"In this view of the statute every owner is entitled, before his

property shall be 'taken up,' to have the benefit of the knowledge and information of the freeholder, and to the exercise of his personal discretion and judgment upon the circumstances of the case, and his personal decision thereon.     *     *     *     *
The father had no right to substitute the information, judgment and discretion of the son for his own.     The son was a mere trespasser; his act was illegal and void, and the subsequent ratification confirmed it only *as such*, as a void and illegal act, upon which no right to the property can be founded."

The application of the above doctrine to this case would not only divest Hartman of any right of possession, or claim to compensation, but would make him a trespasser from the beginning.

But we do not base our decision in this case upon either of the two points above mentioned. There is another point in the case that we consider fatal to the judgment below, which is, that soon after the seizure of these horses as estrays, they were put to work by Hartman, and used by him in his business, as livery horses, up to the day of trial, a period of about two years.

The excuse for this treatment, as given by said defendant is, that they had to be kept twelve months before they could be sold under the estray law, and being kept in the stable, they were put to work so as to make them earn their feed.     That Hall, his co-defendant, purchased them at the sale, and after that they were used as his horses.

It is not pretended here that any title passed by virtue of this sale, but it is strongly contended that defendants are entitled to the possession of the horses until the costs, charges and fees prescribed by Secs. 2565 and 2566, G. L., are paid by the plaintiff, notwithstanding the fact that the sale was void.

This was the view taken by the District Court, and in accordance with the instructions given on the trial, "the jury found the ownership in the plaintiff, and the right to possession in the defendants."

This would be correct, if it could be said that the original taking up was lawful, and that there has been since, no abuse of the authority granted by the statute. It is well settled that a subsequent abuse of the authority will relate back to the seizure, and render the whole proceeding void from the begin-

ning. If the taking up was unlawful, or if it has subsequently become unlawful, the taker-up forfeits all claim to compensation and cannot defend an action for possession of the property on this ground.

The rule is stated in Bacon's Abr., page 451, that: "When the law has given an authority it seems reasonable that the law should, in order to secure such persons as are the objects thereof from abuse of the authority, when it is abused, make everything done void, and leave the abuser in the same situation as if he had done everything without authority."

Defendant Hartman says, the horses were put to work so as to make them earn their feed; his counsel argue that they were gently exercised for the benefit of their health, while the livery stable men and drivers say, they were driven to hacks, and worked the same as the other livery horses at the stable.

Defendants' counsel make the further point, that the driving about publicly of estray horses is an advantage to the owner, in affording better opportunities for the discovery of the animals, when it is done fairly, and with no intention to decieve, as in this case.

It would be a sufficient answer to this proposition, to say the law is otherwise; but as to the driving being an advantage to the owner in this case, we may add, the fact is also otherwise.

One of these animals is a bay gelding without brand or any distinguishing marks, except that the owner says he had a long bushy tail when he went away.

The other animal is a sorrel mare, having white marks by which she could be easily identified. Now the manner of using them prior to the attempted sale was such as to render their identification difficult and improbable. The horses were not driven together, but with other animals, the horse being driven in the day time, and the mare in the night time; when found by the owner shortly after the sale the horse had a short tail, and the owner swears that the bushy part of the tail was cut square off. The witnesses for the defense, however, swear that the hair was not cut off after he came to the stable, but that the horse may have worn it off somewhat, as horses usually do when driven to buggies or hacks. Admitting this to be so, the appearance of the horse would be changed, and

being driven in livery, with a mate pretty closely resembling him in general appearance, it is doubtful whether the owner would have recognized him if he had seen him on the street.

The finding of the jury referred to by counsel, that Hartman acted in good faith in respect to the whole transaction, does not alter the facts of the case as they were shown to exist upon the trial. The question involved is not a question of good faith, but a question of law, and considering it as such, we cannot regard the using of these horses in the manner described by the witnesses, otherwise than as a gross abuse of the authority given by statute. Nor do we think that the supposed necessity or the supposed benefits assigned therefor, afford any justification whatever.

The statute never contemplated the stabling and grain feeding of estray stock, as is evident not only from the expressions employed about *herding* and *ranching*, but from the rate of compensation allowed the taker-up. It provides, that after filing a certain notice, it shall be lawful for the taker-up to *"herd and take charge of said stock."* (G. L., Sec. 2565.) The next section allows him fifty cents per month for "ranching the said stock."

The argument that the continuous working of estray horses in livery, as in this case, may be justified on the ground of necessity, assigning as such necessity, that the animals require exercise to preserve them from injury, or a necessity to cut down the expenses of keeping them; or to place it upon the ground of a benefit to the owner, as affording better opportunities for recognition, is not only illusory and absurd, but is in contravention of legal principles.

The law from the earliest times, has regarded the using of estrays, or distrained animals, as a tort, save only when the use was necessary to their preservation, as in the case of milk cows.

Blackstone says: " When impounded, the goods were formerly, as was before observed, only in the nature of a pledge or security to compel the performance of satisfaction; and upon this account it has been held that the distrainor is not at liberty to work or use a distrained beast." 3 Black. Com., *13.

The case of *Oxley* v. *Watts*, 1 Term Reports, 12, cited by counsel for plaintiff in error, was an action of trespass for tak-

ing a horse, tried before Lord Mansfield. The defendant justi-
fied taking the horse as an estray. It seems that the original
taking was admitted to be lawful, but the Court held that the
subsequent using, made the defendant a trespasser *ab inito*.

In *Sackrider* v. *McDonald*, 10 Johns. R., 252, it was held to
be such an abuse of the power of distraining animals *damage
feasant*, to impound them before the damages were assessed, as
to render the original seizure a trespass.

The opinion was delivered by Kent, C. J., who, in discussing
the principle of carrying back an abuse of authority to the
original taking, says: "This was the settled rule of the common
law, and it has been constantly and uniformly acknowledged
by the Courts; and the distinction is between an entry, au-
thority or license given to one by law, and by the party.

"If the authority be abused, the law in the first case adjudges,
by the subsequent act, *quo animo*, the original entry was made,
and makes the party a trespasser *ab initio*, but not so in the
latter case, because the party cannot, for any subsequent cause,
punish that which was done by his own authority."

The case of *Barrett* v. *Lightfoot*, 1 Monroe, 241, was an action
of trespass for illegally riding, and killing a stray horse. The
defense was, that the defendant took up the animal as an estray,
under the statute, and previous to the ten days allowed by law
to post him as such, caused him to be used in a case of neces-
sity, to send for a physician. Upon demurrer, the plea was
held bad, and this ruling was sustained upon writ of error.

The question presented for decision was, conceding it to be
in general illegal to use an estray before posting, whether this
case, by reason of the necessity that existed for the use, formed
an exception.

The Court was not called upon to decide whether the rule
was different after posting, but the reasoning of the Court and
the authorities cited make no distinction.

The first proposition announced is, that if Barrett acted
under the authority of law in taking up the horse, an y sub-
sequent abuse of that authority makes him a trespasser *ab
initio*.

Barrett relied upon a case in Croke James, 148, as authority
for using the horse, from which case the Court quote the fol-
lowing paragraph: "It is not lawful for any to use it in any

manner, unless in case of necessity and for the benefit of the owner, as to milk milch kine, because otherwise they would be spoiled; and so of the like. But to use a stray horse by riding or drawing is tortious, although it were alleged that the common course is to use stray horses, with withes about their necks."

Upon the above citation, the Court comment thus: "It will at once be admitted that the case in Croke goes as well to establish the principle that strays cannot in the general be used, as that there may exist such a necessity for using them as to form an exception to the general principle, and render the use lawful. But to have that effect, the necessity must, we apprehend, be of a different sort to that which is alleged in the plea of Barrett.

"The illustration made by the Court in the case cited, shows the sense in which the expression, *necessity*, was intended by them, and proves conclusively, that strays cannot lawfully be used by the taker-up, unless to use them be necessary to preserve them from injury, and for the benefit of the rightful owner. There being, therefore, no such necessity for using the horse by Barrett, alleged in his plea, the use was illegal, and an abuse of the authority of law, and as such the demurrer to the plea was correctly sustained."

The cases of *Nelson* v. *Merriam*, 4 Pick., 249, and *Adams* v. *Adams*, 13 Pick., 384, recognize the same doctrine of the foregoing authorities, and all are in accord with the ruling that the using of estrays, save as to the exceptions mentioned, is tortious, and that the taker-up forfeits his claim for compensation.

These views being in conflict with the theory upon which the cause was tried, and with the instructions of the Court below, the judgment will be reversed and the cause remanded for further proceedings, etc.                              *Reversed.*

*A. W. Brazee,* attorney for plaintiff in error.

*Benedict & Phelps* and *E. B. Sleeth,* for defendant in error.